WHITTENTON MILLS *vs.* GEORGE B. UPTON & others.

A manufacturing corporation under the laws of this commonwealth cannot form a partnership with an individual.

A manufacturing corporation and an individual who have actually made a contract of partnership, and, either with or without the assent of all the stockholders of the corporation, acted and held themselves out to third persons as copartners for many years, and contracted debts as such, cannot, upon the petition of such individual, be put into insolvency as a partnership, under *Sts.* 1838, *c.* 163, and 1851, *c.* 327; and proceedings in insolvency so instituted will be suspended by this court upon the application of the corporation.

PETITION by a manufacturing corporation to set aside proceedings in insolvency, instituted against the corporation and William Mason, of Taunton in the county of Bristol, as partners, upon Mason's petition; to restrain the assignees appointed under those proceedings from further interfering with their estate; and

to compel the judge of insolvency to entertain a petition of the corporation for the benefit of the insolvent laws respecting insolvent corporations. The facts of the case, as appearing by the report of a special master in chancery, were as follows :

The Whittenton Mills were incorporated by *St.* 1836, *c.* 19, for the purpose of manufacturing cotton goods at Taunton ; and, at the time of organizing under their charter, adopted by-laws, extracts from which are copied in the margin.*

The Taunton Manufacturing Company, a corporation authorized by their charter (*St.* 1822, *c.* 44) to manufacture iron, copper, cotton and wool, failed in 1836, and their property was divided among their creditors. The Whittenton Mill, one of their establishments, was taken by certain persons who had been stockholders in the Taunton Manufacturing Company and became stockholders in the Whittenton Mills corporation.

Leach & Keith and Crocker & Richmond, occupying a machine shop, foundry, tools and machinery which had previously belonged to the Taunton Manufacturing Company,

---

* The officers of the corporation shall be a treasurer, agent, clerk and three` directors. The agents, under the authority of the directors, shall superintend and manage all the active business of the company — the erection of buildings, construction of machinery, purchasing stock, manufacturing and selling goods, and receiving and paying debts ; and they shall have power to make all such contracts as may be necessary for the purposes aforesaid, and to settle and adjust the same. The directors may call meetings of their board in such manner as they shall prescribe, and, at any such meeting, two shall constitute a quorum for the transaction of business. They shall have power to purchase mills and mill sites, and any real estate necessary or convenient for carrying on the business of the corporation. They shall have power to appoint agents, and remove them from office ; to appoint a clerk or treasurer *pro tempore* in case of vacancy or absence ; to appoint, or authorize the agent to appoint, all other needful officers under him ; to fix salaries and compensations for all the officers and agents employed by the company ; to direct the number and extent of buildings to be erected, the extent and kind of machinery to be constructed or purchased, and the extent and kind of manufactures to be carried on ; to declare dividends ; to call meetings of the corporation ; to instruct the agents and other officers, and regulate and control their doings, and exercise a general superintendence and control over all the officers of the corporation. Meetings of the directors may be holden at any time and place for the transaction of any business when all the board are present without any previous notice.

furnished the greater part of the machinery required for the Whittenton Mill from 1836 until 1842, when they failed, and their foundry, machine shop, tools, machinery and stock passed into the hands of officers of the law for sale and distribution among their creditors, and the tools, machinery and stock were purchased and the foundry and machine shop hired by Mason.

On the 28th of May 1842 the Whittenton Mills and Mason made an agreement in writing, that the corporation should advance to him the money necessary to pay for said tools, machinery and stock, and for the rent of the shop and foundry, and for the stock and labor which might be required in carrying them on, and be paid interest on the advances; and that, after paying a certain annual salary to Mason, the profits on patents then held or afterwards obtained by him, and all other profits derived from the manufacture of machinery or other work of the machine shop, should be equally divided between the parties, for five years. On the 1st of June 1845 the parties further agreed in writing that their joint business should be done and their joint property held in the name of William Mason & Company; and the shops hired by them and their stock of tools and machinery being insufficient, that land should be purchased, buildings erected and machinery and tools purchased or constructed forthwith to supply the deficiency; that Mason, besides an annual salary, should receive a certain sum on each spindle made by the parties under his patents, or sold to others; that the firm and their successors should have the right to use, without charge, all inventions and improvements in machinery made by Mason during the continuance of the agreement; that interest should be allowed to each party on all sums furnished for the use of the partnership; that the accounts should be stated annually, and be at all times open to the examination of the parties; that the profits, after deducting the allowance to Mason, should be equally divided between him and the Whittenton Mills; and that the agreement should continue in force for seven years from its date, unless sooner cancelled by mutual consent. And it was afterwards by agreement in writing extended for three years more.

It was a great convenience for the Whittenton Mills to have the control of a foundry and machine shop, situated, as this foundry and shop were, within two miles of their factory, and to have the right to use the patterns in the shop, and the patents of Mason. The officers of the corporation made these agreements with the sole object of realizing profits from the manufacture and sale of machinery, and at the time of executing the agreement of 1842 the Whittenton Mill was in full operation and was supplied with all the machinery required.

Under and in pursuance of these agreements, the firm of William Mason & Company, composed of Mason and the Whittenton Mills, carried on a very extensive business, (averaging $175,000 a year, and amounting in one year to $350,000,) confined to the manufacturing of machinery for cotton mills till 1852, when they built one locomotive engine. From this time, the manufacture of locomotive engines received an increasing share of their attention till their insolvency in 1857, when it constituted about one half of their business.

During the period of the partnership, the greater part of the machinery required by the Whittenton Mills was manufactured and sold to them by William Mason & Company. In the purchase and sale of this machinery the parties dealt with one another as strangers. Mason & Company also made repairs upon the machinery of the Whittenton Mills to the amount of $4000 during that time. And Mason & Company manufactured and sold to other persons and corporations large quantities of tools and machinery; and stated and rendered to the Whittenton Mills, as partners, annual accounts of the copartnership business, which resulted every year until 1852 in large profits, half of which, according to the terms of said agreements, was paid over or credited annually to the Whittenton Mills, and was by that corporation distributed, with their other profits, among their stockholders. Since 1852 the firm have been doing a losing business.

The capital stock of the corporation was divided into two hundred shares, the par value of which was five hundred dollars. The nature of the business in which Mason & Company were

engaged, and the manner of conducting it, were throughout known to all the officers of the corporation; and to all the stockholders, except one, who was the owner of four shares from the time of the organization until 1854, when he transferred them to one of the other stockholders, and who never attended a meeting of the corporation, but was a relative of a majority of the officers and of the stockholders, and with two of them was in the habit of consulting on his business affairs, and greatly relied on their judgment.

At and for some time before the insolvency aforesaid, William Mason & Company were employed in making machinery, which they had contracted to furnish to the Whittenton Mills, to the value of $35,000. The materials had all been procured, and the work was about three quarters done. It was generally known, in the shop of Mason & Company, and in the town of Taunton, and to many of the persons who furnished the materials and performed the labor on this machinery, that it was building for the Whittenton Mills. And debts for such materials and labor, to the amount of $4000, have been proved against the estate of Mason & Company.

Mason contributed to the copartnership nothing but his skill and patent rights. The Whittenton Mills contributed all the capital required, and advanced to Mason & Company all the money to pay for the machinery, stock and tools originally purchased; and afterwards, from time to time, made further advances to pay the accruing rents, and for the stock and labor, as well as for the land purchased, and the tools and machinery required in carrying on the copartnership business, and were credited with these sums, and with interest thereon, in the annual accounts stated and rendered by Mason & Company. The advances were made with the expectation that they would be reimbursed out of the profits. The lands were all conveyed to William Mason and his heirs, but were purchased for copartnership purposes, and the purchase money was charged in the copartnership account.

The general agent of the corporation, (who was also their treasurer for a portion of the time,) and Mason, represented to

third persons, with whom the partnership was dealing, that the corporation was a member of the partnership. Two of the directors testified that they never heard a doubt suggested that this partnership was a valid one till said insolvency proceedings were commenced ; and there was no evidence that its validity was ever questioned until that time, by any person. One person, acting under a power of attorney, executed by Mason, and by the Whittenton Mills through their general agent and with the knowledge of their clerk, on the 12th of January 1857, purporting to authorize him to use their partnership name " in signing and making checks and drafts and receipts, and indorsing drafts, checks, bills receivable, and bills of exchange," represented to those with whom he was negotiating for money and supplies for the shop that the Whittenton Mills was a member of the partnership, and upon the faith of such representations obtained money and materials to a large amount.

The Boston Manufacturing Company, incorporated in 1813, ( *St.* 1812, *c.* 92,) " for the purpose of manufacturing cotton, woollen and linen goods," erected at Waltham the first power loom mill in this country ; and have a machine shop, in which they made the machinery for their own mill and for the two cotton mills of the Merrimack Company, the first erected in Lowell ; and have also made machinery, in large quantities, for cotton mills in Baltimore, Lowell and other places. The Elliot Manufacturing Company, incorporated in 1823, ( *St.* 1823, *c.* 11,) " for the purpose of manufacturing cotton goods," furnished from their shop the machinery for one of the mills in Nashua, N. H. Cotton manufacturing companies generally have, connected with their mills, machine shops, or " repair shops," as they are called ; and it is customary for such companies, when they have a good mechanic, and the patterns for a valuable machine, to furnish such machines to other factories.

This case was argued before all the judges on the 16th of June.

*S. Bartlett & B. R. Curtis,* for the petitioners. 1. A manufacturing corporation, created by a law of this state to carry on business therein, pursuant to the Rev. Sts. *cc.* 38, 44, cannot

enter into a general copartnership with either a natural person or another corporation, even for the prosecution of the same business for which it was chartered.  The powers of a corporation are only those expressly granted, and those implied, because needful, or, perhaps, usual and customary, for the ends which the corporation was created to attain.  *Salem Milldam* v. *Ropes*, 6 Pick. 32.  *Beaty* v. *Knowles*, 4 Pet. 166.  Angell & Ames on Corp. §§ 229, 239, 256.  The power to form a general copartnership is neither expressly granted, nor needful to transact the business of manufacturing.

The entire legislation of the State for the regulation of manufacturing corporations proceeds upon the assumption that each corporation will conduct its own several affairs separately, by means of its own duly appointed officers and agents, acting in the name and behalf of the corporation ; and its interests and affairs cannot be committed to a partnership, and conducted under the rules and principles which govern partnership business and liability, without violating the public policy of the State, exhibited by its legislation, and removing the safeguards erected for the security of those who may become creditors of the corporation.  Rev. Sts. c. 38, §§ 1, 2, 22, 25.  In a partnership, the individual partner, (in this case Mason,) might do anything, within the scope of the business, not only without the concurrence of the directors, but against their will.

2. If this manufacturing corporation had power to enter into a contract of copartnership, it could not make this contract for the prosecution of a business foreign to the only purpose for which it was created, which was "for the purpose of manufacturing cotton goods in the town of Taunton, in the county of Bristol ; and for this purpose" only it was to "have all the powers and privileges, and be subject to all the duties, restrictions and liabilities set forth in the" Rev. Sts. cc. 38, 44, and might hold real and personal estate to a certain amount.  *St.* 1836, c. 19.  It could not take or hold real or personal estate, either jointly or severally, for an object foreign to that business *First Parish in Sutton* v. *Cole*, 3 Pick. 240.

Its charter binds its capital and credit solely to the purpose

of making cotton cloth. This charter is one of the public laws
of the State. Every person who deals with the corporation in
its legitimate business has the right to assume that to be its
only business; and the application of its capital and credit,
through a partnership, to a distinct and different branch of busi-
ness, is in direct contravention, not only of public policy, but of
the express provisions of the public law of its creation. *Bag-
shaw* v. *Eastern Union Railway*, 2 Macn. & Gord. 389. *Beman*
v. *Rufford*, 1 Sim. N. S. 550. *Colman* v. *Eastern Counties Rail-
way*, 4 Railw. Cas. 513, and 10 Beav. 1. *Caledonian & Dum-
bartonshire Junction Railway* v. *Magistrates of Helensburgh*, 2
Macqueen, 391.

3. The assent of all the members of the corporation, if given,
is unimportant. They could not enlarge the powers of the cor-
poration, nor make that legal which was contrary to the express
provisions of a public law. *East Anglian Railways* v. *Eastern
Counties Railway*, 11 C. B. 775. *Macgregor* v. *Official Man-
ager of Dover & Deal Railway*, 18 Ad. & El. N. R. 618.

4. No creditor of Mason & Company can charge the corpora-
tion as a partner by reason of his dealings with the so called
firm. The charter being a public law, every creditor, assuming
to trust the corporation, either jointly or severally, is bound to
take notice of it and its legal consequences, and so had notice
that the corporation could not be a partner in this firm. This
corporation could not empower an agent to sign either of the
contracts of partnership. The attempt to do so was void, not
merely for want of power, (as a similar attempt of a *feme covert*
at common law would be,) but also because a violation of ex-
press law. *East Anglian Railways* v. *Eastern Counties Railway*,
*ubi supra.* *Macgregor* v. *Official Manager of Dover & Deal
Railway, ubi supra.* *Shrewsbury & Birmingham Railway* v.
*Northwestern Railway*, 6 H. L. Cas. 113, 137. *Root* v. *Godard*,
3 McLean, 102. *Berry* v. *Yates*, 24 Barb. 199. *Mechanics'
Savings' Bank* v. *Meriden Agency*, 24 Conn. 159. *Pennsylvania,
Delaware & Maryland Navigation* v. *Dandridge*, 8 Gill & Johns.
248. *Sumner* v. *Marcy*, 3 Woodb. & Min. 112. Angell & Ames
on Corp. §§ 229, 239. *A fortiori,* Mason himself, on whose peti-

tion the corporation were decreed insolvent, could not allege and set up the partnership.

5. If there was a valid subsisting partnership between Mason and the corporation, the insolvent laws of the Commonwealth do not authorize a decree, making the corporation legally insolvent, upon the petition of Mason. The *St.* of 1838, *c.* 163, is confined to natural persons, and has no reference to the insolvency of bodies corporate; the *St.* of 1851, *c.* 327, is confined to corporations, and has no reference to the insolvency of natural persons. *Sargent* v. *Webster,* 13 Met. 503. *Cheshire Iron Works* v. *Gay,* 3 Gray, 531. It would have been strange if the *St.* of 1851 had made provision for the insolvency of a partnership consisting of a natural person and a body corporate or two bodies corporate ; for, if it is legally possible for such a partnership to exist, under the laws of this state, it was a very remote possibility and unlikely to be anticipated and provided for. The *St.* of 1851 has not only studiously omitted all provisions concerning partnerships, but has made an express provision in § 12 that the surplus, if any, after paying the debts of the corporation, shall go back to the corporation ; which is necessarily inconsistent with the rights of joint creditors, and clearly shows they were not provided for.

*E. R. Hoar & H. Gray, Jr.* for the assignees. 1. A corporation has the same power as a natural person to make all contracts not prohibited by law, and which are necessary or usual in transacting the business which it is authorized by law to transact. The power to make a contract of partnership is not a distinct corporate power, to be created or conferred only by a special grant ; but, like the appointment of an agent — and each partner is, as between themselves, an agent of the other — is only one mode or instrumentality of effecting the lawful objects for which the corporate powers were given. A corporation therefore may form a contract of copartnership to effect any purpose which it may lawfully accomplish by other means, agencies or instrumentalities. Angell & Ames on Corp. §§ 95, 96, 271, 272. *Canal Bridge* v. *Gordon,* 1 Pick. 304, 307. *Peckham* v. *North Parish in Haverhill,* 16 Pick. 287. *Old Colony*

*Railroad* v. *Evans*, 6 Gray, 38, 39. *Catskill Bank* v. *Gray*, 14 Barb. 479. *Catskill Bank* v. *Hooper*, 5 Gray, 584, 585. *Conkling* v. *Washington University*, 2 Maryland Ch. 508. *Shrewsbury & Birmingham Railway* v. *London & Northwestern Railway*, 17 Ad. & El. N. R. 663, 665, 2 Macn. & Gord. 353, and 6 H. L. Cas. 135. *Great Northern Railway* v. *South Yorkshire Railway & River Dun Co.* 9 Exch. 642.

This case falls within the principle upon which congress has been held to have the power to incorporate a bank, although no such power is expressly granted, and the Constitution declares that all powers not delegated are reserved. 1 Kent Com. (6th ed.) 249–254.

The Whittenton Mills are shown to have made and acted under agreements of copartnership with William Mason. " Trading corporations are affected, like private persons, with obligations arising from implications of law, and from equitable duties which imply obligations ; with constructive notice, implied assent, tacit acquiescence, ratifications from acts and from silence, and from their acting upon contracts made by those professing to be their agents ; and generally, by those legal and equitable considerations, which affect the rights of natural persons." *Melledge* v. *Boston Iron Co.* 5 Cush. 175.

2. The subject of those agreements was within the scope of the chartered powers. A corporation for the manufacture of cotton by machinery may make or repair, as well as purchase, the machinery which it has occasion to use. It may make this machinery in a machine shop which it owns or hires, either alone, or in connection with any other person or corporation. It may make this machinery, either by itself, or in conjunction with any other person or corporation, who desires and has lawful authority to engage in the manufacture of machinery. It is found, as matter of fact, to have been the custom of cotton manufacturing corporations, from the commencement of the cotton manufacture in this commonwealth, to manufacture machinery for their own use, and for sale in large amounts to others, without special authority by statute ; and that the obtaining of machinery in this way was a great convenience and

economy to the corporation in this case. *Ante*, 585, 587. The fact that the sole purpose of the officers who made these agreements on behalf of the corporation was to make money, cannot affect. the validity of the partnership ; because that was the object of all the business of the corporation ; and because that object does not appear to have been disclosed to any parties with whom the partnership or the corporation transacted business.

Similar powers are lawfully exercised, and a like construction of the incidental and implied authority conferred by a charter is recognized, in analogous cases. A manufacturing corporation may own a water privilege, dam, warehouses, teams and carriages, weighing apparatus, a herd of cows to furnish manure for dyeing, fire engines, shares in an aqueduct, a reservoir and the like. Cannot it insure in a mutual insurance company, and thus incidentally engage in the business of insurance ? Or keep a shop, as a convenient mode of paying its operatives, and allow other persons to purchase goods there ? Or own a school-house, church, parsonage or hall for lectures or meetings ? Or associate itself with other persons or corporations owning mill privileges on the same stream, in constructing a reservoir for their common benefit ? And cannot a parish or religious society let rooms under its church for shops or schools, or its cellars for storage ? *Chester Glass Co.* v. *Dewey*, 16 Mass. 102. *St.* 1814, c. 4. *Spaulding* v. *Lowell*, 23 Pick. 71. *Lowell Meeting-house* v. *Lowell*, 1 Met. 538. *The Banks* v. *Poitiaux*, 3 Rand. 136. In whom did the property purchased in the first instance for the partnership vest, if not in the firm ?

3. The facts show that the nature of the business of the partnership and the manner of conducting it were known throughout to all the officers of the corporation ; and to all the stockholders, except an owner of one fiftieth part of the stock ; and he stood in such a relation to the others as to be bound by their knowledge, and had moreover ceased to be a stockholder three years before the insolvency. This assent of all the officers and stockholders of the corporation precludes any inquiry into the validity of the partnership, so far as concerns contracts already executed.

*Canal Bridge* v. *Gordon,* 1 Pick. 304. *Graham* v. *Birkenhead Lancashire & Cheshire Junction Railway,* 2 Macn. & Gord. 146. *Marsh* v. *Keating,* 2 Cl. & Fin. 289. *Ffooks* v. *Southwestern Railway,* 1 Sm. & Gif. 142, 164.

4. If the corporation, in making this contract of partnership, exceeded its chartered powers, such violation of the charter can only be alleged by the Commonwealth, in proceedings against it for a forfeiture of the charter; and the validity of the contract cannot be called in question, or the rights of innocent third persons resulting from it interfered with, by its creditors or debtors, and least of all by the corporation. *Chester Glass Co.* v. *Dewey,* 16 Mass. 102. *Silver Lake Bank* v. *North,* 4 Johns. Ch. 373. *Moss* v. *Rossie Lead Mining Co.* 5 Hill, 137. *State of Indiana* v. *Woram,* 6 Hill, 37. *Quincy Canal* v. *Newcomb,* 7 Met. 276. *White* v. *South Shore Railroad,* 6 Cush. 412. *Leazure* v. *Hillegas,* 7 S. & R. 313. *Baird* v. *Bank of Washington,* 11 S. & R. 418. *The Banks* v. *Poitiaux,* 3 Rand. 136.

If there was a copartnership valid to any extent, it cannot be objected to the claims of those who have dealt with it in good faith, that the corporation has, in some respects, exceeded its chartered powers. *Eastern Counties Railway* v. *Hawkes,* 5 H. L. Cas. 338, 350, 368, 381, 382, and 1 DeGex, Macn. & Gord. 737. *Doe* v. *Horne,* 3 Ad. & El. N. R. 766. *The Queen* v. *White,* 4 Ad. & El. N. R. 111, 112. *Horton* v. *Westminster Improvement Commissioners,* 7 Exch. 780. *Allegheny City* v. *Mc Clurkan,* 14 Penn. State R. 81.

Most of the cases cited by the petitioners were either of refusals to enforce a contract in equity, not of active interference to set it aside; or they were cases of railroad corporations, which are public in their nature, and not like mere trading corporations. *Treadwell* v. *Salisbury Manuf. Co.* 7 Gray, 404.

5. A corporation, which has formed a lawful contract of copartnership, or one which is obligatory upon it to any extent, or as to any persons, may be brought under the operation of the insolvent laws as a partner, upon the petition of its copartner, in conformity with the provisions of *St.* 1838, *c.* 163, § 21. The legislation of Massachusetts concerning persons is to be taken

50 *

to include corporations, whenever the same reasons will apply to them; and the purpose and effect of the *St.* of 1851, *c.* 327, were to follow out the policy of the *St.* of 1838, *c.* 163, and to extend the insolvent system of the Commonwealth, which had been previously limited to natural persons, to corporations, and thereby secure an equal distribution of all insolvent estates among their creditors. Rev. Sts. *c.* 2, § 6, *cl.* 13. *Dearborn* v. *Ames,* 8 Gray, 1. In *Cheshire Iron Works* v. *Gay,* 3 Gray, 531, there was a distinct remedy under the statutes, by application to this court. Neither of the statutes authorizes a creditor to initiate proceedings more extensive in their effect than either of his debtors could. If this petition of the Whittenton Mills can be sustained, there is no means by which the estate of this insolvent partnership can be brought under the operation of the insolvent laws of the Commonwealth. The effect would be to leave the insolvent system in this anomalous condition : Insolvent debtors are subject to it; insolvent partnerships are subject to it; insolvent corporations are subject to it; but an insolvent partnership, composed of an insolvent individual and an insolvent corporation, is beyond its reach.

THOMAS, J. This is a petition to this court, sitting in equity, and as such having, by the *St.* of 1838, *c.* 163, the jurisdiction and the supervision of all proceedings in insolvency. The averments of the petition are admitted by the answers of the respondents. Nor is there a question upon the facts agreed that a copartnership was entered into by the Whittenton Mills and the said Mason, and for the purposes stated, if the corporation was capable in law of entering into and forming such partnership and for such ends.

But the petitioners say, first, that the Whittenton Mills could not enter into any legal partnership ; secondly, that if it were so capable, it could not form a copartnership for the prosecution of a business foreign to the purpose for which alone it was created; thirdly, that if such legal partnership existed, the petitioners were not liable to be declared insolvent upon the petition of Mason and under the *St.* of 1838, *c.* 163, and the acts in addition thereto ; such acts respecting only natural persons and making no provision for bodies corporate.

At the threshold of the cause and of its elaborate discussion is the question, Was this corporation capable of forming a partnership, of entering into the contract? This question presents itself in two forms. The more general one is : Has a corporation, as one of its usual inherent powers, the capacity to form a contract of copartnershĭp ? The narrower question, but for this case the practical and pertinent one, is, Can a manufacturing corporation in this commonwealth, incorporated since February 1831, and subject to the provisions of the thirty-eighth and forty-fourth chapters of the revised statutes, enter into a contract or society of copartnership ?

This corporation was created in March 1836 as a manufacturing corporation, for the purpose of manufacturing cotton goods in the town of Taunton, and for that purpose was invested with all the powers and privileges and made subject to all the duties, restrictions and liabilities set forth in the thirty-eighth and forty-fourth chapters of the revised statutes, passed on the fourth of November preceding, but not to take effect till the first of May eighteen hundred and thirty six. *St.* 1836, *c.* 19. This charter, with the provisions of the chapters referred to and made part of it, is the origin and source of the powers and functions of the corporation. What powers are granted expressly, or by implication, because necessary or usual for the purposes which this charter was given to effect, the corporation has, and no more.

There is one obvious and important distinction between such a society as this charter creates and that of a partnership. An act of the corporation, done either by direct vote or by agents authorized for the purpose, is the manifestation of the collected will of the society. No member of the corporation, as such, can bind the society. In a partnership each member binds the society as a principal. If then this corporation may enter into partnership with an individual, there would be two principals, the legal person and the natural person, each having, within the scope of the society's business, full authority to manage its concerns, including even the disposition of its property.

The second section of *c.* 38 of the Rev. Sts. provides that the

business of every such manufacturing corporation shall be managed and conducted by the president and directors thereof and such other officers, agents and factors as the company shall think proper to authorize for that purpose. It is plain that the provisions of this section cannot be carried into effect where a partnership exists. The partner may manage and conduct the business of the corporation, and bind it by his acts. In so doing he does not act as an officer or agent of the corporation by authority received from it, but as a principal in a society in which all are equals, and each capable of binding the society by the act of its individual will.

Indeed, in examining this chapter, it will be found that there is scarcely a provision for the conduct of the business of a manufacturing corporation that is not inconsistent with the existence of a contract by which the power to manage the business of the company and to bind the corporation by his acts is vested in one not a member of the corporation nor its officer or agent. Such are the third, fourth and fifth sections, providing how the president and directors, and other officers, agents and factors of the corporation shall be chosen. Such too is the sixth section, which authorizes every such company to make by-laws for its own regulation and government. Such are the several provisions authorizing the stockholders to fix the amount of the capital stock, to increase the same within the limit fixed by law or to reduce it. §§ 9, 11, 19. And such is the provision requiring the president and directors to give annual notice of the amount of the debts of the corporation; the means of stating which would not be in their power if another principal had the power of creating the debts. § 22. Of the same character is the twenty-fifth section, by which it is declared that the whole amount of the debts which the corporation shall at any time owe shall not exceed the amount of the capital stock actually paid in, and which renders the directors, under whose administration an excess shall occur, liable personally to the extent of such excess; a provision evidently based upon the ground that the exclusive power to contract debts is vested in such directors, and that they cannot be divested of it, and which is wholly in-

consistent with the existence of a power in the corporation to enter into a contract of partnership, by which another principal would be created, having equal power to contract debts and to bind the partnership and the corporation *in solido.*

Indeed the effect of all our statutes, the settled policy of our legislature, for the regulation of manufacturing corporations is that the corporation is to manage its affairs separately and exclusively; certain powers to be exercised by the stockholders, and others by officers who are the servants of the corporation and act in its name and behalf. And the formation of a contract, or the entering into a relation, by which the corporation or the officers of its appointment should be divested of that power, or by which its franchises should be vested in a partner with equal power to direct and control its business, is entirely inconsistent with that policy.

The power to form a partnership is not only not among the powers granted expressly or by reasonable implication, but is wholly inconsistent with the scope and tenor of the powers expressly conferred, and the duties expressly imposed, upon a manufacturing corporation under the legislation of the Commonwealth.

The difficulties would be obviously greater in holding such a partnership to be valid, when formed and carried on for the prosecution of a business other than that, if not foreign from that, for which the corporation was created. It is difficult to see how the corporation should engage in such business, even when under its own control, still less to enter into copartnership with third persons for that purpose.

By the *St.* of 1852, *c.* 195, not adverted to in the argument, corporations created for the manufacture of woollen and cotton goods are authorized to carry on certain other manufactures, bu this only when four fifths of the stockholders shall, by vote at a special meeting called for the purpose, consent to the same. This statute furnishes a pretty strong implication that the power to carry on a different business from that for which the corporation was chartered. did not exist before the statute was passed.

We are therefore all of opinion that in the formation of the alleged partnership the corporation exceeded the powers given by its charter expressly or by implication, and that the contract of copartnership was illegal and void.

It is said however by the respondents that if this be so, such violation of the charter can only be alleged by the Commonwealth upon proceedings for a forfeiture of the charter, and that the validity of the partnership cannot be called in question by the corporation or by its creditors or debtors.

As the basis of proceeding against the Whittenton Mills in insolvency upon the petition of Mason under the *St.* of 1838, *c.* 163, § 21, even supposing that the provisions of that statute are not limited to natural persons, it was necessary to show the existence of an actual copartnership between Mason and the corporation. It was not sufficient to show that they had so conducted as to be liable to third persons as partners; they must be partners *inter sese*. *Hanson* v. *Paige*, 3 Gray, 239. There must be a contract of copartnership between them. Into such a contract the petitioners were incapable of entering.

But the case rests upon broader grounds. The charter of the corporation is part of the public law. Rev. Sts. *c.* 2, § 3. Those who deal with the corporation must take notice of the extent of its powers, and that the corporation is legally incapable of entering into the contract of partnership; that that contract was beyond the scope of its authority, and that this incapacity resulted from considerations not personal or peculiar to this corporation or its members, but from general grounds of public policy, which the corporation and those dealing with it cannot be permitted to contravene and defeat. That policy is to confine these corporations within the limits prescribed by law, to protect the stockholders from liabilities which the charter and laws do not create; and, while it imposes upon the stockholders of the corporation heavy responsibilities, to retain to them the legal control of its business and conduct of its affairs.

The precise point at issue before us is the validity of these proceedings in insolvency. That depends, as before remarked, upon the existence of the partnership between the Whittenton

Mills and Mason. Upon that only could the petition of Mason be sustained.

It is not necessary for this purpose to decide how far these considerations will affect those claiming to be the creditors or debtors of the alleged partnership. It is in this point of view only, that the cases of *Chester Glass Co.* v. *Dewey*, 16 Mass. 94, *Quincy Canal* v. *Newcomb*, 7 Met. 276, and *White* v. *South Shore Railroad*, 6 Cush. 412, can be deemed material. They have the tendency to show the existence of a contract between the Whittenton Mills and Mason, which the former is estopped to question.

In the case of *Chester Glass Co.* v. *Dewey*, one ground of defence to the recovery for goods sold and delivered by the plaintiff corporation was, that the corporation was prohibited from trading. The court held, that the legislature did not intend to prohibit the supply of goods to those employed in the manufactory. That certainly was the end of the matter. The court however added, that the defendant could not refuse payment on this ground, but that the legislature may enforce the prohibition by causing the charter to be revoked. This suggestion will be entitled to consideration if a question should arise as to the right of the alleged company to recover for goods sold, but it certainly is not conclusive upon the relation of the partners *inter sese*.

In *Quincy Canal* v. *Newcomb*, it was held, that, where a canal was opened and toll claimed and the defendant used the canal, he was liable to the payment of such toll and could not avoid such payment by showing that the canal had not been made so deep as the statute required.

In *White* v. *South Shore Railroad*, it was held, that the defendants were liable for damages in constructing their road through and across a mill pond authorized by the general court to be raised in a navigable river, though in erecting the dam for raising the pond the condition of the act permitting it had not been complied with. The court said, that the railroad company could not take the petitioners' pond from them because the dam was not constructed in compliance with the act; that whether it had been so constructed was a matter between the government and the petitioner.

If the assent of all the stockholders were shown to the forma‑ tion of the partnership — which is not the fact — it could not enlarge the powers of the corporation, or make that legal which was inconsistent with the law limiting their powers and pre‑ scribing their duties. Whether, if such assent were available, it could be manifested in any other mode but a vote of the stock‑ holders, it is not necessary to inquire.

The decision of the question as to the existence of the part‑ nership between the Whittenton Mills and William Mason in the negative renders unnecessary the inquiry whether, if a part‑ nership had existed, the petitioners could be subjected to the provision of the insolvent law of 1838, *c.* 163, and the acts in addition thereto.

The proceedings in insolvency founded upon the petition of Mason as the partner of said Whittenton Mills under the firm of William Mason & Company were illegal and must be vacated and set aside, so far as they affect the estate of the Whittenton Mills. A mandamus must issue to the judge in insolvency for the county of Bristol to proceed upon the petition of the Whittenton Mills, to hear the parties, and, good cause be‑ ing shown, to issue his warrant thereon.

*Decree accordingly.*